party in interest, in the dealings between his brother and Chamberlin subsequent to September, 1826, or as one of the copartners in the business which was carried on at Mill Grove, after Moore went there, in the fall of 1828. It is not necessary, therefore, that I should examine the question, whether the sworn deposition of D. McCormick could be used as evidence to contradict his testimony in this suit, as to the complainant's being the copartner instead of himself, without first calling upon him and inquiring whether he had not sworn differently upon a former occasion.

The fact being satisfactorily established, that D. McCormick, and not the complainant, was the person who was interested in the business which was commenced at Mill Grove, in the fall of 1828, it is very evident that this suit was not properly instituted, in the name of H. McCormick, for an account of that business; but that D. McCormick, the real party in interest, should have filed a bill in his own name. Without taking up time to comment at length upon the testimony in this case, it is sufficient to say that there is nothing, established by the proofs, which would have authorized the vice chancellor to give any relief whatever to the complainant upon the bill, in this cause, which he has permitted to be filed in his name.

The decree of the vice chancellor must therefore be affirmed, with costs.

---

SANDFORD, receiver, &c. vs. THE TRUST FIRE INSURANCE COMPANY.

Where a parol agreement was made with the president of an insurance company, to insure the buildings of the assured, and the president made a brief memorandum of the terms of the agreement, upon the application book of the company, but no policy was made out pursuant to such agreement, because the assured gave notice to the company that he wished to have the risk differently apportioned, and no premium was paid or secured, nor was the premium charged to the assured; and the assured was notified that he must come to the office and settle the busi-

ness, or the company would not consider itself liable in case of loss, but the assured did not call, nor did he pay or secure the premium; *Held,* that the parol agreement to insure was not a consummated contract, and that the company was not liable for a loss which subsequently occurred.

Whether a parol agreement to insure is valid, by the law of this state? *Quære.*

THIS was an appeal, from a decree of the late assistant vice chancellor of the first circuit, dismissing the complainant's bill. The bill was filed by the complainant, as the receiver appointed in a creditor's suit against Cowles, Brother & Co., to recover compensation for a loss of the property of that firm by fire, on the 17th of August, 1839; under an alleged agreement of The Trust Fire Insurance Company to insure the same, for one year from the first of July 1839. The facts, as they appeared from the pleadings and proofs, were as follows: Cowles, Brother & Co. consisting of H. B. Cowles, T. G. Cowles & E. H. Hodges, were the owners of the chemical works situate on Troy-street, in the city of New-York, called the Manhattan Chemical Works. In June 1839 Dammers, the surveyor of the respondents, applied to H. B. Cowles, with whom he was acquainted, to know if his firm did not wish to insure; and being informed that they did, he took a survey of the part of the chemical works on the south side of Troy-street, upon the stock, fixtures, engines and buildings, of which they proposed to insure $5000. But as they were then unwilling to pay the premium which Dammers supposed that the company would ask, the matter remained open until the evening of the first of July thereafter. On that evening Dammers the surveyor, and Wheelwright the president of the insurance company, met H. B. Cowles, by accident, at the Sans Souci Hotel, where the president was introduced to Cowles, as one of the firm who had proposed to insure upon the chemical works on the south side of Troy-street. And after considerable conversation as to the amount of the premium &c., the president agreed verbally to insure $5000 on the premises, for one year, at one and a half per cent premium; to be divided as follows: $3000 upon the stock of the firm, $1000 upon the fixtures, including the steam engine, and $1000 upon the buildings, the time to commence on that day. The next day the president

made a brief memorandum of the terms of the agreement, upon the application book of the corporation, except that in such memorandum the name of the firm of Cowles, Brother & Co. was not correctly stated, nor was there any description of the character of the buildings to be insured.   No policy was made out, as H. B. Cowles, a few days after the first of July, saw Dammers, the surveyor, and told him that he wanted the risk differently apportioned; and no premium was paid, nor was any premium note given, nor was there any charge made upon the books of the corporation against Cowles, Brother & Co. for the premium.   Dammers, the surveyor, by the direction of the president, spoke to H. B. Cowles, several times, to call at the office of the corporation and determine as to the distribution of the risk, so as to have the insurance completed; but he neglected to do so.   And a few days before the fire, Dammers again called on him, and told him that he must come down and settle the business that afternoon, or the insurance company would not consider itself liable for any loss.   But H. B. Cowles did not come down, nor give any information to the officers of the company as to how the risk should be apportioned; nor did Cowles, Brother & Co. ever pay, or offer to pay, the premium for the insurance, before the fire occurred; although by the published proposals for insurance, by the corporation, one of the conditions was that no insurance, whether original or continued, was to be considered as binding until the premium was paid.   Shortly after the fire, Cowles, Brother & Co. made a claim upon the corporation, but upon being told by the president the reason, why he did not consider the corporation bound for the loss, nothing further was said.   And having rebuilt their works, in the following October they insured them with this company, and took out a policy and paid the premium charged for the risk; which was two and a half per cent.   They subsequently failed, and a creditor's bill having been filed, and a receiver appointed in that suit, in December, 1839, the complainant as such receiver, on the 19th of March, 1840, made a claim upon the corporation for the loss, and then furnished the preliminary proof of loss.

Sandford *v.* The Trust Fire Insurance Company.

*E. H. Owen & A. S. Johnson,* for the appellants. The complainant has all the rights of Cowles, Brother & Co. The contract set forth in the bill, of which performance is sought, is fully established, and is a valid and effectual contract of insurance. There is no statute which required this contract to be in writing, unless it was the act of incorporation of the defendants; and that act did not require it. The sixth section of the act of incorporation, (*Sess. Laws,* 1836, *p.* 80,) was intended to enable the company to contract without as well as *with* their corporate seal. It was not the intention of the legislature to take away, or withhold from the company, the ordinary power which they, as well as other corporations, have *to make* valid contracts, either without writing, or by sealed instruments. It may be that a *policy,* executed in any other manner than that prescribed by this section, would not be valid ; but the contract of insurance and the *policy* are two separate and distinct things ; the latter is merely the evidence of the contract, (23 *Wend.* 18,) and must be made in conformity to it; and if through fraud or mistake it is not, this court has power to correct it and make it conformable. (*Phœnix Fire Insurance Co.* v. *Gurnee,* 1 *Paige,* 278.) It does not follow that because the *policy* must be executed in a particular way to make it valid, the contract of insurance must be made in that way also ; for if so, then all the contracts made in respect to their ordinary business, to be valid, must be in writing and signed as directed by the act.

The power of corporations to contract by parol, and by writing, with or without their corporate seal, and their liability upon contracts express and implied, are now well settled ; and the rule appears to be that they may be bound by the acts of their agents, as well as their own, although not under their corporate seal, and even when they are not reduced to writing, except in those cases where, by the provisions of the statute of frauds or otherwise, the contract must be in writing to render it valid if made by a private person. (2 *Kent,* 288, *&c. with the cases cited. Moss* v. *Oakley,* 2 *Hill,* 265. *The Attorney Gen.* v. *The Life and Fire Insurance Co. In Chancery,*

decided 15th March, 1842. The American Ins. Co. N. Y. v. Charles Oakley, decided in this court 5th April, 1842.)

A parol contract of insurance is valid; there is no law *prohibiting it*, and the power of contracting in this way will not be taken from a corporation by implication. It is the common way in which insurance companies do their business. A contract of insurance is made, and that is followed up by a delivery of the policy of insurance, or in other words, the evidence of the contract; but if that evidence be unjustly withheld, and the contract of insurance can be otherwise established, the insured may come into this court and claim to have the policy executed and delivered, or, in case of loss, payment of the loss. (*Perkins* v. *Wash. Ins. Co.* 4 *Cowen*, 645. *Lightbody* v. *N. American Ins. Co.* 23 *Wendell* 18. *Thayer* v. *Middlesex Ins. Co.* 10 *Pick. Rep.* 326. 2 *Phillips on Ins.* 396. 6 *East*, 583. 4 *Yates*, 475.) Unless the defendants can show that the contract was so vague, uncertain, or inconsummate, as to have rendered it impossible for them to make out a policy, they cannot object to their liability for the want of it. The promise to pay the premium was a sufficient consideration to support the contract. And the payment of the premium was not a condition precedent, to be performed by the insured, before the contract of insurance became binding. Payment of the premium is not essential to the validity of a contract of insurance; it only becomes so, when the company, at the time of contracting, or at the time of delivering the policy, make it a condition precedent; it then comes into operation like conditions precedent in all other contracts. (*See Kohm* v. *Ins. Co.*, 1 *Condy's Marshall*, 335; 1 *Wash. C. C. R.* 93.) It was almost the invariable custom of the company to deliver the policy before or at the time they received the premium.

The payment of the premium, as a condition precedent, was waived by the president's informing Cowles, at the time the contract was made, that they might consider themselves insured from that time. (*Thompson* v. *Todd*, 1 *Peters C. C. R.* 380.) The contract, once made, could only be rescinded, by the consent of both parties. (4 *Paige*, 17. 17 *John.* 357.)

The application to have the apportionment of the amount insured altered, did not in any manner affect the validity of the other part of the contract. (*Disbrough* v. *Nutson*, 3 *John. Cas.* 81. *Giles* v. *Bendley*, 2 *Id.* 253.) It had no other effect upon the contract than it would have had if the defendants had refused to alter the apportionment, when the application was made. The preliminary proofs were, under the circumstances, furnished in due time. (*McLaughlin* v. *Wash. Co. Mut. Ins. Co.* 23 *Wend.* 525. *Cornell* v. *LeRoy*, 9 *Id.* 163. *Barker* v. *Phœnix Ins. Co.* 8 *John. R.* 317. 7 *Cowen*, 645. 11 *John.* 260.) The furnishing preliminary proofs was waived by the company. The president, when applied to for payment of the loss, repudiated the contract and refused to recognize it as a valid contract, and for that reason he refused to pay the loss. This repudiation of the contract of insurance, rendered it unnecessary to furnish the proofs. (*Francis* v. *Ocean Ins. Co.* 6 *Cowen*, 408; *S. C.* 2 *Wend.* 64. *McMasters* v. *Bruce*, 25 *Id.* 379. *Lawrence* v. *Columbia Ins. Co.* 10 *Peters*, 507. 17 *Wend.* 385, *above cited.* *Vos* v. *Robinson* 9 *John.* 193. 8 *Id.* 307. 7 *Id.* 315.

If a vendee of real estate tell the vendor, before the day of performance, that he will not perform his contract, a tender of the deed is unnecessary. (*Franchet* v. *Leach*, 5 *Cowen*, 506. *Calhoun* v. *Vechio*, 3 *Wash. C. C. R.* 165.)

*G. N. Titus*, for the respondents. No contract of insurance, binding on the company, was ever made. A verbal contract of insurance is void. Invariable practice, ever since the contract of insurance was known, has established that it must be in writing, by an instrument denominated a policy. This invariable practice has resulted necessarily from the nature of the contract, which consists of a great variety of stipulations and conditions as to the situation and circumstances in which the subject insured is and is to be used. And these stipulations are of the substance of the contract. For a party to agree *to insure* the house of another against loss by fire, without making the usual stipulations and conditions, would be no more a contract than if one should agree *to*

*build* a house for another without specifying the materials, size or plan. That the law is settled, that these contracts must be in writing, is strongly, if not conclusively, inferred from two facts. *First,* That such is obviously the understanding of the legislature, as is evinced by the provisions contained in all charters of insurance companies as to the manner of executing this contract, to wit, by a policy, " *signed* by the president and *countersigned* by the secretary" and in other similar particulars which are inconsistent with the supposition that this contract *could* be made verbally. And this understanding of the legislature is also to be deduced from the great improbability of their omitting to make any special provision for this contract of numerous details, which, though it may always be executed within a year, is seldom expected to terminate until the end of a year; whilst they have required all contracts, however simple, which are to be continued for a year, to be in writing. *Second,* that *no case* has been found, by the complainants' counsel, in which a verbal contract of insurance *has ever been sanctioned by a court.*

The provision in the charter that " there shall be distinctly and legibly printed or written upon the face of every *policy of insurance,* or other contract or obligation made by said corporation, the amount of its capital actually paid in," not only, by a necessary implication, inhibits the making of any contract which cannot by possibility be made in compliance with this provision, but it also contains an obvious expression of the understanding of the legislature, as is urged above, that there is no such thing known as a contract of insurance, except a written or printed policy of insurance. (*See Sess. Laws of* 1836 *p.* 244 § 6; *Id. of* 1839, *p.* 209, *changing the name.*) The insured are not only by law chargeable with notice of the provisions of the charter, (*Safford* v. *Wychoff,* 1 *Hill* 16,) but the complainant expressly claims the contract to have been made by the company under the authority conferred upon it by its charter. If this company might have made a verbal contract, their president was not authorized to make such a contract for them. Corporations, like natural persons, are bound only by the acts and contracts of their agents when done and made within the scope of their

authority.   (2 *Kent's Com.* 292, 2d *ed.*)   No authority on the part of the president, to make this contract, is shown, and no such authority could be inferred from the duties which presidents of insurance companies usually perform, or from any act of this company, or any provision of its charter.   What passed between the president and Mr. Cowles was not a contract, or understood to be one by the parties.   The company did not make out the policy, or make any entry of the contract in their books, or in any manner carry it into their business.   And Cowles, Brother & Co. did not ask for the policy, or any other evidence of the contract, or pay the premium.   But if what was said at the time, was intended for a *contract of insurance* in itself, it was void for want of consideration, no premium being paid.   If it is said that it was an agreement in which the mutual promises are respectively the consideration for each other, it was an executory mutual agreement, in which each party must show performance, on his part, before he can claim performance of the other.   In this case, Cowles, Brother & Co. did not offer to perform until performance on the part of the company was rendered impossible, by the destruction of the subject of the insurance.   If a binding contract was made on the 1st of July, it was conditional and temporary, to continue only long enough to make the contract in form, and to pay the premium and execute a policy, and it tetrminated with the lapse of the time proper for this purpose.

The complainant cannot ask this court to decree a specific performance, by executing a policy, or to give relief as though a policy had been executed.   This court will lend its aid to compel a party, who has made a contract, to furnish the requisite evidence of that contract, to enable the other party to enforce it in a court of law; or it will give the same relief here as the party would be entitled to at law if the contract had been in due form; but this court does not *make* contracts for parties.   Unless a contract of insurance was actually made, the complainant has no more claim to relief here than he could have at law; and it is supposed to have been already shown that no contract was made.

The contract originally made, whether it be considered a contract of insurance in itself, or an agreement giving the complainant a claim to a specific performance, was abrogated when Cowles, Brother & Co. gave notice that the amounts were not divided as they wished, and proposed to call and make a new division. The insured have abandoned and lost their claim to indemnity, by not complying with the ninth condition of insurance, by furnishing the preliminary proofs as soon as possible after the loss. That the furnishing the preliminary proofs as soon as possible after the loss is a condition precedent, without the performance of which the insured cannot recover, is abundantly established by numerous cases in our courts of recent date. (*Inman* v. *The Western Fire Ins. Co.*, 12 *Wend.* 482, *and cases cited by the court. The Ætna Fire Ins. Co.* v. *Tyler*, 16 *Id.* 385, *opinion of the chancellor, p.* 401. *M'Laughlin* v. *The Washington Co. Mutual Ins. Co.*, 23 *Id.* 525.) In none of the cases cited were the insurance companies held to have *waived* the preliminary proofs *entirely*, but simply to have been estopped from objecting to *formal defects* in the proofs. In every case the proofs *had been furnished in due season*, and the company, after having examined them, or had an opportunity to do so, communicated with the insured upon the subject of the claim, *without objecting* to the defect, or, as in one of the cases, when the objection was made, refused to return the proofs so that they might be corrected.

All the cases concur in establishing that the acts on one side which will excuse the performance of this condition, by the other, are such as lead him to suppose that such performance will not be required.

THE CHANCELLOR. From the view I have taken of this case, it is not necessary for me to decide the question whether a parol agreement of insurance, not evidenced by writing in any way, is valid and binding ; or whether there is any thing in the charter of this particular corporation to prohibit it from contracting to insure, by a mere parol agreement, not evidenced by writing and subscribed by some of the agents of the corporation. In

England, the stamp act necessarily requires all contracts for insurance to be in writing. The French code also requires the contract of insurance to be in writing. (*Com. Code of Fr. Book* 2, *art.* 332.) And the Spanish law is the same, in substance. (*Span. Code of Com. art.* 812, 841.) Millar says the importance of the contract of insurance, and the singularity of those obligations which it is intended to create, have, in all commercial states, rendered a deed in writing essential to its validity. (*Millar on Ins.* 30.) But he refers to no authority ; and I have not been able to find any thing in the common law of England, rendering it absolutely necessary that contracts for insurance should be in writing ; although the custom has been, so far as I can ascertain, to have some written evidence of the agreement to insure. A policy of insurance necessarily imports a written contract, as the name of the instrument, derived from the Italian, necessarily implies. I am not prepared to say, however, that in this state there may not be a valid parol agreement, founded upon a good consideration, to execute a written policy of insurance, which a court of equity may enforce ; although there is no written evidence whatever of the agreement, or of any of its stipulations or conditions.

The agreement in the case under consideration, however, was clearly not a consummated contract of insurance ; and neither of the parties could have so understood it, at the time it was entered into. But it was an agreement, on the part of Wheelwright, that the corporation, of which he was the president, would give to Cowles, Brother & Co. a policy, in the usual form and upon the usual conditions of insurance by such corporations, insuring $5000 upon the premises, for one year from the first of July, 1839, upon being paid the premium of one and a half per cent for the risk ; such risk to be apportioned as then stated, unless the assured, previous to the consummation of the insurance, should desire to have such apportionment of the risk changed. And both parties unquestionably understood that if a loss should occur before the insurance could be consummated in the usual form, the corporation would be answerable therefor. But as there was no agreement to give credit for the premium, and no

Sandford *v.* The Trust Fire Insurance Company.

implied agreement for a credit beyond the time which was necessary to prepare the policy, the neglect of Cowles, Brother & Co. to pay the premium after they were called upon to complete and consummate the insurance, would of itself have been such an abandonment of the agreement, of the first of July, 1839, as to deprive them of all right to claim pay for the subsequent loss; either at law or in equity. In this case also, the notice given by H. B. Cowles, a few days after the first of July, that the apportionment of the risk as then specified was not right, and that he wished it changed, was of itself an abandonment, or at least a suspension of the contract, until the apportionment should be adjusted according to his wishes. And he having been expressly notified that if he did not come to the office and complete the arrangement by a particular time, the insurance company would no longer consider itself holden to insure, or to be responsible for any loss that might thereafter occur, his neglect to attend, as requested, put an end to the previous agreement to insure; so that neither party was thereafter bound, either at law or in equity, to proceed further in the consummation of the bargain. The notice, given by the corporation, was an election on their part to abandon their claim to the premium unless the contract should be completed, if they ever had any legal claim upon Cowles, Brother & Co. therefor. And the neglect of the latter to pay the premium, or to enable the insurance company to execute and tender the policy, because the distribution of the risk was not ascertained, put an end to all pretence of claim on the part of those who were to have been insured, for any subsequent loss they might sustain. And after what occurred at the last interview between Dammers and H. B. Cowles, previous to the fire, in connection with the other evidence in this case, I am perfectly satisfied that Cowles, Brother & Co. would not have considered themselves under any legal or even honorary obligation to pay the premium had no subsequent loss taken place.

In deciding this case, I lay entirely out of view what H. B. Cowles testified to, on his examination before the master in the creditor's suit. The insurance company not being a party to that proceeding, had no right to cross-examine; and his exami-

nation is not legal evidence against the respondents in this case, for any purpose. Besides, he was directly interested against the insurance company in relation to the matter of that examination. For whatever might be recovered by the receiver would, at the termination of the creditor's suit, either be applied to pay the debt of the firm, or if the complainant in that suit did not succeed in obtaining a decree against Cowles, Brother & Co., the funds in the hands of the receiver would of course be paid over to them. The proceedings upon the creditor's bill, therefore, are not legal evidence, in this suit, for any other purpose than to show that the present complainant had been duly appointed a receiver of the property and effects of the firm of Cowles, Brother & Co., and the time of such appointment; and that they had assigned such property and effects to the receiver, to abide the further order of the court in that suit. And upon the evidence which was properly before the assistant vice chancellor, I have no doubt that he arrived at the correct conclusion, that the appellants were not liable, either at law or in equity, for the loss occasioned by the fire of August, 1839.

The decree appealed from is therefore affirmed, with costs.