OLIVER L. SANBORN & another *vs.* FIREMAN'S INSURANCE COMPANY.

A contract of insurance need not be in writing.

An insurance company authorized by their charter " in their name and by the signature of their president for the time being, or by the signature of such other person and in such form and with such ceremonies of authentication as they may by their rules and by-laws direct," to make contracts of insurance, have authority to make an oral contract of insurance.

The agent of an insurance company, authorized by them " to effect fire insurance upon buildings, goods, wares and merchandise, and for this purpose to survey risks, fix the rate of premium, and issue policies of insurance signed by the president, attested by the secretary, and countersigned " by himself, has authority to make an oral contract of insurance.

An oral contract of insurance for one year including its date is a contract to be performed within a year, and therefore not within the statute of frauds.

In an action upon an oral contract of insurance, the plaintiff's agent testified that he prepared a general application, and left it at the office of the defendants' agent, and the clerk of the latter came to him and said that he would take two thirds of the risk and allow a certain commission; that the plaintiff's agent went to the defendant's agent, and the amount, rate and time of insurance were agreed upon between them ; that the two agents had running accounts with each other and settled once a month; that the same afternoon the property was destroyed by fire, and the defendants' agent called upon the plaintiffs' agent and said he did not consider the risk completed. *Held,* that there was evidence for the jury of a contract of insurance, which began immediately.

In an action upon an oral contract of insurance, the defendants' book of entries of risks taken, in which the alleged contract is not entered, is inadmissible to prove there was no contract.

ACTION OF CONTRACT on an agreement to insure the plaintiffs' stock of paper and hydraulic press in the Gerrish Market in Boston, against fire for the term of one year from and including the 12th of April 1856. At the trial before *Hoar,* J., the following facts were proved:

The defendants were an insurance company established under the laws of South Carolina. Their charter provided

that " the said corporation in their said name, and by the signature of their president for the time being, or by the signature of such other person and in such form and with such ceremonies of authentication as they may by their rules and by-laws direct, shall have a right to make contracts and underwrite policies of insurance and indemnity against fire " on buildings, vessels, goods, wares and merchandise, and other property, within or without that state.

Oliver Brewster was their agent in Boston, authorized by his power of attorney "to effect fire insurance upon buildings, goods, wares and merchandise," " and for this purpose to survey risks, fix the rate of premium, and issue policies of insurance, signed by the president, attested by the secretary of the said company, and countersigned by the said Oliver Brewster, and to assent to the transfer and assignment of the same, which policies, so issued and assigned, shall have full force and effect to bind said company."

The property was of greater value than the amount alleged to have been insured thereon, and was destroyed by fire about one o'clock in the afternoon of the 12th of April 1856. Then plaintiffs, after the fire and before suing, demanded payment of the loss, and also demanded policies, and offered to pay the premium.

William H. S. Jordan, called as a witness for the plaintiffs, testified as follows: " I am an insurance agent; I was employed by the plaintiffs some days before the 11th of April to effect insurance on their stock and hydraulic press in the Gerrish Market; on the 11th of April I went to Oliver Brewster and asked him if he was disposed to take a risk in the Gerrish Market; after some conversation as to rate and companies, he said he thought he could take it in the Farmers' and Mechanics', and in the Fireman's Insurance Companies; and if I would furnish an application and survey, he would see. I prepared a general application and survey for $ 6000 insurance, and left it at Brewster's office that afternoon, but Brewster had then gone. About twelve o'clock the following day, the 12th of April, Brewster's clerk came in and said Brewster would take two thirds

of the risk, one third in each company, and would only allow me five per cent. commission. I replied that I would go and see Brewster, and did so immediately, at his office. Brewster and I agreed to alter the amount to one third of $1000 on the press, and one third of $5000 on the stock, in each company. There were no other companies spoken of as binding the risk; we may have spoken of other companies for the balance of the insurance that I wanted. Brewster offered to negotiate for the balance, but I told him I would fix that myself. Rate fixed on was one and a half per cent.; property, as described in application; time, one year. I caused an entry of the transaction to be made in my books. Brewster and I had accounts with each other, commenced in 1853; we settled once a month; we completed the policy, delivered it, and charged the premiums, and at end of the month settled, and usually paid the balance in cash."

On cross examination the witness testified: "Brewster would allow me only five per cent. commissions; it is very probable that we did talk the matter of commissions over; I urging my ten, he saying five per cent. was enough. I made an agreement for the insurance, which was completed; but about commissions I have no recollection. I went to get further insurance at other offices. I then returned to my office, and finding there would be fractions, I sent a paper by a boy to Brewster about the division of the risk — $333 on the press, and $1667 on the stock. I did not know then of the fire. Brewster came in immediately after the return of my boy, and said, 'I see that building is on fire;' I said, 'I heard it is;' he gave me to understand that he did not consider the risk completed on his part."

After the plaintiffs had introduced their testimony, the defendant requested the judge to instruct the jury as follows: "1st. That the contract of insurance is required to be in writing, and that a suit at law is not maintainable on an oral agreement. 2d. That the laws of South Carolina incorporating this company require that the insurance should be by a policy signed by the president, &c., and that a suit could not be maintained upon an oral agreement of Brewster to insure. 3d.

That Brewster had no authority to bind the company in any other way than by a policy signed by the president, attested by the secretary, and countersigned by himself. 4th. That this being a contract not to be performed within a year, it was void by the statute of frauds. 5th. That there was not sufficient evidence of a complete bargain for the plaintiff to maintain his case." The presiding judge, for the purposes of the trial, ruled the first four points in favor of the plaintiffs, and ruled that there was evidence to go to the jury of a contract of insurance.

The defendants then called as a witness Oliver Brewster, who, after describing the interview with Jordan on the 11th of April substantially as Jordan had done, testified further as follows : " The next day I saw the application on my desk ; I sent my clerk down to Jordan, to say that we could not allow him full commission ; that it was an extra-hazardous risk. Jordan came up to the office soon after, about twelve o'clock, and we had some conversation. Jordan claimed the full commission of ten per cent., and I refused to allow that, on account of the character of the risk. I proposed dividing it among several companies, as it was not a good risk. The point in dispute between us was the amount of the commission. I said I would not allow it; he claimed the full commission. There was no agreement ; nothing was said about my insuring this property, and leaving the commission open. The next thing I heard was, a boy came up from Jordan's office with a memorandum, I think half an hour after. I told the boy I would see Jordan ; I went down immediately. On my way down I heard of the fire, and just put my head into Jordan's office, and told Jordan we had no insurance on the building."

Upon cross-examination Brewster said : " I had ten per cent. commission allowed me by the defendants. Jordan's commission would come from my commission, and not from the defendants. I went to Jordan's office, because the boy came up and said Jordan wanted insurance effected. The boy said that the memorandum which he brought contained the division Jordan wanted made of the risk. I went because I had not effected any insurance, and I wanted him to know he was not

insured.   The only advantage to the defendants of five per cent. commissions over ten per cent. commissions was in discouraging the offering of such risks, by not allowing full commissions. I was not a moment in Jordan's office ; merely said I had no insurance for him on Gerrish Market.   He said he hoped I would pay the loss.   I had a monthly account with Jordan ; generally settled premiums and commissions once a month."

The defendants further proved that Brewster always had blank policies of the company, signed by the president, and attested by the secretary, which he countersigned and issued, to insure parties applying.

The defendants also, to corroborate Brewster's testimony, and as evidence tending to show that there was no agreement for insurance completed, offered in evidence a book kept by him for them, in which he entered all risks taken by him for the company, as soon as taken.   But, upon objection of the plaintiffs, the judge ruled that the book was inadmissible.

After the jury had retired, they came into court and inquired of the judge whether it was necessary for them to find that the commissions to be allowed Jordan by Brewster were agreed upon between Jordan and Brewster.   The judge instructed them that they must determine whether the commissions of Jordan were a part of the contract for insurance ; and that if they were satisfied that the commissions were no part of the bargain for insurance between Jordan and Brewster, but that they had agreed upon the insurance and the terms thereof, and left the commissions to be adjusted between themselves, they should find for the plaintiffs.

The jury found for the plaintiffs, the defendants alleged exceptions, and the judge reported the case to the full court.

*C. W. Loring & J. Lathrop,* for the defendants.

*H. C. Hutchins,* for the plaintiff.

Hoar, J.*   1. The first ground of objection to the verdict is, that a contract of insurance can only be made in writing.   No principle of the common law seems to require that this contract,

---

* Hoar, J. sat through the rest of this term, and Dewey, J. did not sit again except as hereafter mentioned.

any more than other simple contracts made by competent parties upon a sufficient consideration, should be evidenced by a writing. No statute of Massachusetts contains such a requirement. Upon principle, therefore, we can find no authority in courts to refuse to enforce an agreement which the parties have made, if sufficiently proved by oral testimony. On the contrary, there are decisions which recognize contracts of insurance resting in parol. *M' Culloch* v. *Eagle Ins. Co.* 1 Pick. 280. *Kennebec Co.* v. *Augusta Insurance & Banking Co.* 6 Gray, 204. *Commercial Mutual Marine Ins. Co.* v. *Union Mutual Ins. Co.* 19 How. 318 ; affirming *S. C.* 2 Curt. C. C. 524. *Hamilton* v. *Lycoming Mutual Ins. Co.* 5 Barr, 339. Some of the text writers, indeed, express a doubt whether valid insurance could be made, except in writing. Mr. Duer, in his treatise on insurance, remarks that " in this country there is no statute in any of the states, that requires that the contract of insurance shall be in writing; and upon the principles of the common law, an unwritten, or in technical language, a parol agreement, is doubtless sufficient; but as the usage of a written contract has long and universally prevailed, it has probably acquired the force of law, and it is doubtful whether an action upon a contract, merely oral, would now be sustained." 1 Duer Ins. 60. See also 1 Phil. Ins. § 8. In *Smith* v. *Odlin,* 4 Yeates, 468, Chief Justice Tilghman expressed a doubt whether a valid insurance could be made otherwise than in writing; and in *Cockerill* v. *Cincinnati Mutual Insurance Co.* 16 Ohio, 148, it was held that it could not.

But in 1 Parsons Marit. Law, 19, the opposite opinion is stated. In *Sanford* v. *Trust Fire Ins. Co.* 11 Paige, 556, Chancellor Walworth discusses the question without deciding it, the inclination of his opinion seeming to be in favor of the validity of the oral contract. And it was so held by the court of appeals in *Trustees of First Baptist Church* v. *Brooklyn Fire Ins. Co.* 19 N. Y. 305. It is not easy to see the force of the reasoning which would infer, that, because parties usually make their contract in one way, it would be void when they choose to make it in another, equally good at common law, and not

prohibited by any statute. In determining whether, in any case, a complete and perfect contract had been made, the circumstance that a contract in writing was contemplated, and had not been executed, would certainly be entitled to a great weight. *Real Estate Mutual Fire Ins. Co.* v. *Roessle,* 1 Gray, 336.

2. The next objection is, that the defendants had no authority to make the oral contract declared on, because they were by their charter authorized only to make contracts by the signature of their president or of such other person as their rules and by-laws should direct. The case chiefly relied on to support this position is that of *Head* v. *Providence Ins. Co.* 2 Cranch, 127. But while the principle which that case declares, that a corporation, being the mere creature of law, can have no powers but such as are derived from the act which creates it, is undoubtedly a sound one, the application of the principle has been very much modified in other cases. *Bank of Columbia* v. *Patterson,* 7 Cranch, 299. *Mechanics' Bank of Alexandria* v. *Bank of Columbia,* 5 Wheat. 326. *Bank of United States* v. *Dandridge,* 12 Wheat. 69. *New England Marine Ins. Co.* v. *De Wolf,* 8 Pick. 56. *Foster* v. *Essex Bank,* 17 Mass. 497. *Tayloe* v. *Merchants' Fire Ins. Co.* 9 How. 390. *Commercial Mutual Marine Ins. Co.* v. *Union Mutual Fire Ins. Co.* 19 How. 318. We cannot think that a provision in the charter of an insurance company, authorizing contracts authenticated by the signature of a particular officer, and without any words of restriction, should generally be construed to limit the powers of the company, and to prevent them from making contracts within the ordinary scope of their chartered powers. On the contrary, the phraseology of those statutes respecting the execution of policies should be regarded as consisting simply of enabling words, not restraining the power which they confer to make contracts, of which the policies are the evidence. 19 How. 321, before cited.

3. The objection that the agent had only power to issue policies, and not otherwise to make contracts binding on the defendants, comes within the same rule of construction. His

power of attorney authorized him " to effect insurance," and " for this purpose to survey risks, fix the rate of premium, and issue policies of insurance, signed by the president," &c. We are of opinion that this gave him authority to make the preliminary contract, as well as to issue the policy. He was not a special agent, employed merely to receive and transmit proposals to his principal, but had power to do whatever the company could do in effecting insurance; and it appeared by the evidence of the defendants that he was furnished with policies signed in blank, to be filled up and issued at his discretion.

4. We are of opinion that the contract was to be performed within a year, and is therefore not included in the provisions of the fifth clause of the Rev. Sts. *c.* 74, § 1. When time is spoken of, any act is within the time named that does not extend beyond it.

5. We think there was evidence, competent for the consideration of the jury, that the risk was to commence at the time the contract was made.

6. No authority is cited in support of the proposition that the omission to make an entry of a contract in a book kept by one party is evidence, in favor of that party, that no contract was made. Such an entry constituted no part of the contract, and the plaintiff had no knowledge of the habit of the defendants' agent in that respect, and could not be affected by it. It was clearly inadmissible.

*Judgment on the verdict for the plaintiff.*

