56   371
89    35

NANCY E. WALKER *versus* METROPOLITAN INSURANCE COMPANY.

A contract of insurance against fire is not required by the common law, nor by R. S., c. 49, § 12, to be in writing.

Neither does § 14 of c. 49, either in terms or by implication, abridge the powers granted in § 12, in respect to the mode of effecting insurance.

A contract of insurance for one year is not within the statute of frauds.

It is no part of the duty of the assured, in case of a loss, to notify the insurers of the time and nature of the risk; and any misrecital in these respects, contained in a notice of a loss, may be rejected as surplusage.

If insurers intend to rely upon the insufficiency of preliminary proofs of loss, they should request further proofs upon receipt of notice; a failure to do so is a waiver of the right to require such proofs at the trial.

What facts will constitute a contract of insurance.

ON REPORT.

ASSUMPSIT on a contract of insurance against fire. The writ was dated Sept. 25, 1866, and the declaration contained five counts; the first setting out a builder's risk for $3500 for three months, from May 5, 1866; the second, a similar risk for ninety days; the third, a permanent risk, effected July 2, 1866, for one year, for $3500; fourth, an agreement to insure and issue a policy, on July 2, 1866, for the same sum, and a failure to issue the policy; and a money count.

It was admitted that the plaintiff owned the building as alleged, that it was accidently burned by fire on the night of July 4th, 1866, and that her consequent loss largely exceeded $3500.

The notice of loss described a builder's risk for three months or ninety days, from May 26, 1866.

It appeared, on the part of the plaintiff, that John E. Dow & Son were duly appointed agents of the defendants, by a power of attorney, "with full power to receive proposals for insurance against loss or damage by fire, to act as a surveyor of buildings, or other property offered for insurance in Portland and vicinity, and to make insurances thereon, by policies, signed by the president and attested by the secretary of the said Metropolitan Insurance Company, and countersigned by the said John E. Dow & Son, and generally to do and perform all other acts necessary to the successful prosecution of the business of fire insurance."

It also appeared that the plaintiff, in April, 1866, held defendants' policy, on the building destroyed, when it was damaged and the amount of $2000 was agreed upon by the defendants' N. E. agent as the amount of loss; and that the building was subsequently repaired by plaintiff's agent.

John E. Dow & Son, agents of the defendants, testified substantially, — that they kept a blotter or daily record upon which they entered particulars of risks taken by them, and made the policy when convenient; when policies were made and delivered, they collected the premiums; that such

was the custom in all the Portland insurance agencies; that policies were not issued generally until the end of the month; that the defendant company did business in the same manner at their home office; that the defendants have paid in several instances of this kind, where the entries were made in the blotter before, but no policy issued till after the fire, when the company knew all the facts; the defendants' general agent made no objections when he was informed of the witness' mode of doing the business; that entries for all the companies for which witnesses were agents, were all entered in one blotter, which was burnt July 4, 1866; that witnesses took builder's risk on plaintiff's property for $3500, about last of May; that it was entered on the blotter; that about July 1, 1866, before the fire and after June return to home office, they took yearly risk for same amount; entry made in usual form; builder's risk had terminated; the premium was not then paid; that it was not customary to make policies on builder's risks, but usually carried premium of builder's risk, which was short, into permanent risk; considered yearly risk subsisting at the time of the fire; considered risks commenced at date of entry in blotter; made monthly return to home office, and account for all premiums at the end of each month, and accounted for this risk; went to home office at request of defendants after the fire, and they were satisfied with witnesses' mode of doing the business after hearing witness' statement; the repairs on the plaintiff's building were completed before July 1, 1866; told plaintiff's agent witnesses would take it the first of July; were requested to keep it insured; no policy made of last risk to plaintiff; never gave plaintiff or her agent any written memorandum covering the risk; the premium was paid latter part of July, but defendants refused to receive it.

It was also admitted by the defendants, that, in addition to the matters herein before stated, the plaintiff proved that the universal practice at all insurance agencies in Portland, for the last ten years, in regard to the manner of taking

risks and issuing policies, and collecting premiums after the risk is taken, has been in accordance with the custom as stated by John E. Dow and Edwin B. Dow, in their testimony.

*S. C. Strout & Gage*, for the plaintiff.

*W. L. Putnam*, for the defendants.

No bill in equity can be maintained on the facts proved, as our statutes limit the jurisdiction in equity to contracts in writing.

I. John E. Dow testifies, that he was to carry the builder's risk till the last of June. So there can be no claim upon the builder's risk, as the fire occurred July 4th.

II. There have been no proofs for a loss upon a risk for a year, so that no suit can be maintained for such a risk.

1. If any agreement was proved in relation to a risk for a year, it was an agreement to issue a policy, of course with the implied agreement that the policy should be in the usual form of their policies. *Tayloe* v. *Merchants' Fire Ins. Co.*, 9 Howard, 403; *Oliver* v. *Ins. Co.*, 2 Curtis, 291. Or, at most, a verbal agreement for a present insurance until a policy could issue, and upon the usual conditions of the policy.

2. That those conditions required proof of loss appears from the allegation in the counts of the writ, and was admitted by plaintiff when she filed any proof of loss. And they are attached to all policies by statute of Maine, 1861, c. 34, § 5.

3. Nor does the evidence show any waiver of proofs. It nowhere appears that any claim was made on them for a year risk till suit. On the other hand, the proofs of loss were specifically for a builder's risk and excluded any other claim. No such reasons appear for presuming a waiver as appeared in *Tayloe* v. *Merchants' Ins. Co., ante*. And by the affidavit annexed to the proofs, the company were distinctly notified that there was no claim for a year risk. Not

being called upon to pay such a risk, how can they be presumed to have waived anything in relation to it?

4. So much applies to all the counts, except that based upon an alleged agreement to issue a policy for a year risk. There being no proof that defendants were ever called on to issue such a policy, but were called on for something else, that count cannot be maintained. And, as already stated, her sworn proofs of loss exclude the idea of any such demand. Nor would a demand now for such a policy avail anything ; as no proofs having yet been made, it is too late to make them "within a reasonable time," and a policy, if issued, would be valueless.

5. The receipt of premium by J. E. Dow, which was paid him late in July, cannot prejudice the company, as the company never received it; and, as it appears from plaintiff's proofs of loss, that she knew the matter had been referred to the company and Mr. Dow had no authority in the premises.

6. The position of all claims for a year's risk are as follows :—If there was ever a pretence of any such agreement, plaintiff has deliberately, under oath in her proofs, repudiated and disavowed it, while yet inchoate and not formally executed ; and defendants have acceded to the repudiation and disavowal. How could it be recreated without the consent of both parties? How can it be honestly and lawfully set up by plaintiff after such deliberate and solemn disavowal. *Real Estate Ins. Co.* v. *Roessle,* 1 Gray, 336.

III. The agreement to insure, if any was made by Dow, was void under the statute of frauds.

No written memorandum given. The entry on his office blotter was no agreement in writing, was not intended as such, was not signed as required by the statute, and we have no evidence that it contained the proper terms of a contract.

1. This case particularly shows the wisdom of that statute. E. B. Dow thinks builder's risk was $2000, — proofs make it $3500 ; and he thinks the year risk $3500, while

his father says $3500 or $4000. John E. Dow does not know in what office the builder's risk was placed; nor the amount; nor can his son recollect the rate.

2. John E. Dow, some time, last of May or first of June, made, as he says, an agreement to carry builder's risk till July 1, and then to carry for a year as a permanent risk; it was a single agreement covering a year and a month. He further testifies, he put the property in the permanent risk the last day of June, to commence the first day of July; thus doing the last act recognizing any contract before the year commenced.                                         ＼

3. The premium was to be paid within the year; but, as we have seen, it was never really paid, and no attempt was made to pay it till the controversy arose. The case, therefore, does not come within those other cases, where it has been said that the statute did not apply, when the consideration has been fully paid within the year.

DICKERSON, J.—Assumpsit on an alleged contract of fire insurance where no policy had been issued.

The case is submitted on report, upon the evidence deemed admissible, the action to stand for trial if it, or any form of action, in law or equity, can be maintained; otherwise the plaintiff to be nonsuit.`·

At common law, contracts of insurance are placed on the same footing with other contracts, in respect to the capacity of the parties to contract, the subject matter of the contract, and the mode of contracting. There is, indeed, nothing in the nature of a contract of fire insurance which requires it to be in writing. The issuing a policy furnishes a convenient mode of proving the contract, but is not essential to its validity. *Trustees of First Baptist Society* v. *The Brooklyn Fire Ins. Co.*, 19 N. Y., 305.

Section 12, of c. 49, R. S., provides that,—"insurance companies may make insurance * * * * against fire, on dwellinghouses or other buildings, and on merchandize or other property within the United States; and fix the premiums and terms of payment." This language does not

confine such companies to any particular mode of insurance, either verbal or written, but gives them authority to make contracts of insurance, with all their incidents and accessories, in as broad and ample a manner as that enjoyed by natural persons. This provision makes it a corner-stone principle of their franchise, that they have authority to do in the way of insurance, as corporators, whatever private persons may do in their individual capacity. The intention of a statute to limit the general power thus granted must be clear and explicit, in order to authorize the Court to give it that construction.

We do not find such intention expressed or implied in section fourteen of the same chapter, which requires that " all policies of insurance shall be signed by the president, or, in case of his death, inability or absence, by any of the directors, and countersigned by the secretary ;" and it also provides that policies thus executed " shall be binding upon the company as if executed under its corporate seal." This section does not in terms, or by implication, abridge the powers granted in § 12, in respect to the mode of effecting insurance. It provides that insurance companies can make valid " policies of insurance" only when attested in the mode prescribed ; and that, when thus verified, they shall bind the company, though they do not bear its corporate seal. The language is not, all contracts of insurance, as it would have been if it had been the intention to prohibit all other modes of insurance, but it is " *all policies* of insurance." Insurance companies may still exercise their right at common law, of making parol contracts of insurance, if there is nothing in their charter to prevent, but, when they insure by issuing a policy, they must conform to the statute mode. The purpose of this provision undoubtedly was to designate the mode in which the corporate sanction of " policies" of insurance should be expressed, and to relieve the assured from the burden of proving the authority of the persons who thus execute a policy, to bind a corporation.

The construction we have given to these sections of the statute is the same as that given to similar provisions of the statute of New York, in 19 N. Y. above cited, and by the Supreme Court of the U. S. to a section of a statute of Massachusetts, almost identical in language with § 14 of our statute, as well as by the Courts of Massachusetts. *The Commercial Mutual Marine Ins. Co.* v. *The Union Mutual Ins. Co. of New York,* 19 How., 319; *New England Ins. Co.* v. *De Wolf,* 8 Pick., 63.

The writ in the suit at bar contains several counts, but the one relied upon alleges an insurance effected July 2, 1866, for a year, in the sum of $3500. The evidence shows,

1. That the agents of the defendants, residing in Portland, had authority to make any contract of insurance in behalf of the company which it was competent for the company itself to make.

2. That whatever the defendants' agents did in the premises, they did in accordance with the usage at the home office in New York, and all the insurance offices in the city of Portland; and the defendants knew the manner in which their agents conducted their business in Portland, and made no objection to it.

3. That the plaintiff applied to the defendants' agents for a builder's risk of $3500 upon the property alleged to be insured, in May, 1866, and, at the same time, requested them *to keep* the property insured. This the agents agreed to do, at the same time entering the builder's risk in "their blotter," and subsequently, upon the termination of that risk, carrying it into a permanent yearly risk, commencing July 1, 1866, for the same sum, upon the same "blotter."

4. No specific premium was agreed upon, but it was agreed between the parties that the amount of the premium should be deducted from the amount due the plaintiff from the defendants, for a previous loss, upon the same property, when that should be paid; and this deduction was made subsequently to the loss, by the defendants' agents, though the defendants declined to allow the deduction.

5. When a policy is issued, in such cases, the custom is to date it as of the entry in the blotter, though it may be, and usually is made out on a subsequent day. In contemplation of the insurance agents, the risk commences on the day of the entry in "the blotter."

6. After hearing the statements of their agents in this case and other cases, the defendants declared themselves satisfied with the manner in which their agents had conducted their business.

7. No policy was ever issued or demanded; and the property alleged to be insured, together with "the blotter," was destroyed by fire on the night of the fourth of July, 1866.

The question to be determined is whether enough was done to make a complete contract of insurance. It being competent for the defendants, as we have seen, to make a contract of insurance without issuing a policy, the decision of this question must depend upon the intention of the parties, as shown by their acts and declarations. There was an application for a builder's risk, and a permanent yearly risk, and a verbal acceptance of the application; and there were corresponding entries upon the blotter. Though the amount of the premium was not fixed, its payment was provided for by means of money due the plaintiff from the defendants; and it was not customary to pay the premium till the expiration of a month, and, before that had elapsed, the property was destroyed. Besides, the premium was subsequently paid, as agreed. The plaintiff seems to have been content with the arrangement, and undoubtedly intended to effect an insurance, and understood that she had done so. The defendants' agents did the same in this case to bind the parties as was their custom to do in similar cases, as was the universal custom of insurance agents in Portland to do, and as the defendants held them out as authorized to do. The property had but recently been damaged by fire, under a risk assumed at the defendants' office, and the defendants' agents knew the importance to the plaintiff of having it insured; if they did not intend to insure the property, they would have

so informed the plaintiff, that she might have procured insurance elsewhere. The pre-payment of the premium was an advantage to the defendants which they might and did waive. The agreement to insure, without fixing the rates of insurance, is an agreement to insure at the customary rates. What these rates would be, at the termination of the builder's risk, the parties may not have known, and hence they may have purposely omitted to fix the amount of the premium, leaving that to be determined by the rates existing when the yearly risk should commence. All the essential terms of a contract of insurance were agreed upon.

After a somewhat careful examination of the evidence, and the law applicable to it, we think that it was the intention of the parties to make a valid contract of insurance in the sum of $3500 for one year, commencing on the first day of July, 1866, at the customary rates of the defendant company, and that they did all that. was necessary to bind the parties by such contract. This conclusion is consistent with public policy, as it legalizes the long established usage of insurance companies in an important particular, and saves the assured from the danger of losing his property during the interval between his application for insurance, and the receipt of his policy.

The same question came before the Court of Appeals of New York, and the Court held that an agreement to insure and to send the policy to the assured at a subsequent time, was a contract to insure presently, though the amount of the premium was not agreed upon by the parties. *Audubon* v. *The Excelsior Ins. Co.*, 27 N. Y., 223.

As the liability under the contract might accrue within a year, it is not within the statute of frauds.

It is no part of the duty of the assured, in case of a loss, to notify the company of the time and nature of the risk, as these are within its knowledge. Any misrecital, therefore, upon these points, in the notice of a loss, is immaterial, and may be regarded as surplusage.

If the defendants intended to rely upon the insufficiency

of the preliminary proofs of loss, they should have requested further proofs of the plaintiff upon receipt of notice of the loss. Failure to do this is a waiver of the right to require such proofs at the trial. *Bartlett* v. *Union M. F. Ins. Co.*, 46 Maine, 503 ; *Lewis* v. *Monmouth Ins. Co.*, 52 Maine, 497. *Action to stand for trial.*

APPLETON, C. J., WALTON, BARROWS, DANFORTH and TAPLEY, JJ., concurred.

KENT, J., did not concur.

APPLETON, C. J., submitted his views as follows : — A contract of insurance is completed when there is an assent to its terms by the parties, upon a valuable consideration. Neither the giving the premium note nor the reception of the policy of insurance by the insured are prerequisites to its consummation. *Blanchard* v. *Waite*, 28 Maine, 51. The acceptance of a written offer to insure, before its withdrawal, completes the contract. The acceptance may be verbal or in writing, by the principal or his agent.

So, if the insurance company make a verbal offer through their authorized agent to make or renew a policy of insurance on certain terms and conditions, and the offer is accepted, this constitutes a contract binding on both parties. There is, in such case, the assent of both parties *ad idem*. The insurers agree to issue a policy. The insured promise to pay the premium agreed upon. The acceptance of a proposition to insure completes the contract between the insurers and the insured. *Com. Ins. Co.* v. *Hallock*, 3 Dutcher, 645. If the premium is tendered to an agent of an insurance company and he does not receive it, but says he will consider it as actually made, and authorizes the applicants to retain the money till the policy arrives, the contract will be as binding upon the company as if the money had been actually paid to the agent. If the insurance company take the risk previous to the date of the policy, and the property is destroyed before the policy is actually executed and delivered, when there is no fraud nor concealment, the

company will be as much bound as if the loss occurred after the policy was delivered. *Com. Ins. Co. v. Hallock*, 2 Dutcher, 269. "I have not been able to find anything in the common law of England rendering it absolutely necessary that contracts of insurance should be in writing," remarks WALWORTH, Chancellor, in *Sanford* v. *The Trust Ins. Co.*, 11 Paige, 556, "although the custom is, so far as I can ascertain, to have some written evidence of the agreement to insure. A policy of insurance imports a written contract, as the name of the instrument derived from the Italian, necessarily implies. I am not prepared to say, however, that, in this State, there may not be a parol agreement, upon a good consideration, to execute a written policy of insurance, which a court of equity may enforce; although there is no written evidence whatever of the agreement, or of any of its stipulations or conditions." In *Union Mutual Ins. Co.* v. *Com. Mut. Ins. Co.*, 2 Curtis, 545, CURTIS, J., says, — "that he is not aware of any grounds upon which it can be maintained, that the common law requires a contract for a policy of insurance to be in writing." This same view of the law was affirmed by the Supreme Court of the United States, when the same case came under their consideration. 19 How., 318. Indeed, by the entire concurrence of decisions, it may be regarded as established that a contract for a policy of insurance need not be in writing. *Hamilton* v. *Lycoming Ins. Co.*, 5 Barr., 339; 2 Parsons on Maritime Contracts, 19.

If there be an agreement to issue a policy, and the insurers, upon reasonable demand and tender of the premium, refuse to issue it, a court of equity will enforce the performance of the contract. *Perkins* v. *Washington Ins. Co.*, 4 Cow., 645; *Carpenter* v. *Mut. Safety Ins. Co.*, 4 Sandf., 408; *Union Mut. Ins. Co.* v. *Com. Mut. Ins. Co.*, 19 How., 313.

If there be a valid contract, upon sufficient consideration, to issue a policy, an action at common law may be maintained upon such contract. In *McCulloch* v. *Eagle Ins. Co.*,

1 Pick., 278, which was an action of assumpsit upon an agreement to insure, PARKER, C. J., says, "a policy never having been made, the only question submitted is whether there was an agreement to insure; every thing necessary to entitle the plaintiff to recover being agreed by the parties. And, it is certain that, if a contract was made, the mere want of a policy will not prevent the plaintiff from recovering." In *Lightbody* v. *N. A. Ins. Co.*, 23 Wend., 18, BRONSON, J., thought the plaintiff in that case could have maintained an action on the case against the defendants for a refusal to deliver the policy, in which he would have recovered damages to the full amount of his loss. "If the defendants had tendered the policy, we have no doubt," remarks CURTIS, J., in delivering the opinion of the Court, in *Commercial Mut. Mar. Ins. Co.* v. *Union M. Ins. Co.*, 19 How., 318, "an action for not delivering the premium note would have at once lain against the plaintiffs; and we think there was a mutual right on their part, after the tender of the note, to maintain an action for the non-delivery of the policy."

It may be regarded as settled that a verbal agreement upon sufficient consideration to issue a policy of insurance is binding upon the parties thereto, and may be enforced by a suit at law. The promise to pay the premium or give a note therefor is a sufficient consideration for the promise to make a policy.

It is insisted in the defence that the rules of the common law have been changed by the provisions of R. S. of 1840, c. 79, § 14, relating to insurance companies, by which it is enacted that "all policies of insurance made by such companies shall be subscribed by the president, or in case of his death, inability or absence, by any two of the directors, and countersigned by the secretary of the company; and they shall be binding upon the company in like manner as if executed under the corporate seal thereof."

But the distinction between a contract to issue a policy of insurance or to renew one already issued, and the policy to

be issued or renewed in pursuance of such agreement, has always been recognized by the Courts and the text writers upon the subject of insurance. It is the same as that existing in bills of exchange, between an agreement to accept and the acceptance of a bill. They are distinct. The agreement to issue or renew a policy is one thing, the policy issued or renewed is another and different thing. The policy is the consummation of the agreement, the performance of what by its terms is agreed to be done.

The statutes of New York are very similar to those of this State. It was held in *The Trustees of the First Baptist Church* v. *Brooklyn Fire Ins. Co.*, 5 Smith's Reports, Court of Appeals, 305, that a provision, in the charter of such a corporation, that contracts of insurance signed by certain officers shall be valid and obligatory, as if under the corporate seal, does not abridge its general power, but is merely a specification of a mode in which it may be bound by its agents, without subtracting from its power to control otherwise. "There is nothing," remarks COMSTOCK, J., in delivering the opinion of the Court, "in the nature of insurance which requires written evidence of the contract. To deny, therefore, that parol agreements to insure are valid, would simply affirm the incapacity of parties to contract, when no such incapacity exists, according to any known rule of reason or of law."

The section in question was in force at the time of the separation of this State from Massachusetts, and since has been a part of the statute laws of both States. It regards in its terms only the formal mode of signing policies, and has no application to agreements to make insurance. There is no provision of any statute requiring an agreement to make a policy to be in writing. The practice of insurance companies has been in accordance with these views, and the repeated adjudications of courts of the highest authority has affirmed the legality of this practice. The case of the *Com. M. M. Ins. Co.* v. *The Union M. Ins. Co.*, 2 Curtis, 545, affirmed in 19 How., 318, is conclusive upon this point.

In *McCulloch* v. *Eagle Ins. Co.*, 1 Pick., 278; *Perry* v. *Newcastle M. F. Ins. Co.*, 8 Up. Can., Q. B., 360, and in *Goodall* v. *N. E. M. F. Ins. Co.*, 25 N. H., 169, the same principle was fully affirmed.